840 F.2d 18
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Mike RADABAUGH, Defendant-Appellant.
 No. 86-3459.
 United States Court of Appeals, Sixth Circuit.
 Feb. 22, 1988.
 
 Before WELLFORD, DAVID A. NELSON, and BOGGS, Circuit Judges.
 PER CURIAM.
 
 
 1
 Defendant Mike Radabaugh was found guilty of conspiring to fix a sporting event by bribery, in violation of 18 U.S.C. Sec. 224, and was given a two year suspended sentence. Mr. Radabaugh makes five arguments on appeal: (1) that the court did not make a determination on the voluntariness of his self-incriminating statements; (2) that the court erred in admitting evidence under Rule 801(d)(2)(E), Fed.R.Evid.; (3) that the court's instructions to the jury relieved the government of its burden of proving each element of the crime beyond a reasonable doubt; (4) that the court erred in limiting the redirect examination of a defense witness; and (5) that the court erred in recalling one of the government's witnesses. Finding none of these arguments to have merit, we shall affirm the conviction.
 
 
 2
 * Beginning in January of 1984, the United States investigated the fixing of horse races in the Southern District of Ohio and the Northern District of Kentucky. An FBI agent posed as a harness horse owner as part of the investigation.
 
 
 3
 The investigation revealed that Charles Castleberry, a cook at a number of racetracks, learned through his contacts with drivers of harness horses which drivers were willing to accept money in order to fix races. The FBI agent hired Perry Carpenter as the driver and trainer of a horse owned by the government; Carpenter introduced the agent to Castleberry. On May 22, 1984, Castleberry arranged to fix the sixth race to be run the next day at a racetrack in Latonia, Kentucky. Carpenter was to drive the government horse in that race.
 
 
 4
 The agent testified that on the morning of the race Castleberry told him that he had arranged for a horse driven by Mike Radabaugh, the defendant, to finish out of the money. Castleberry said that Carpenter had brought Radabaugh to him out of concern that Radabaugh could finish the race ahead of Carpenter. In return for Radabaugh's promise not to do so, Castleberry had allegedly promised to give him trifecta tickets that would allow Radabaugh to profit from the fixed race.
 
 
 5
 The plan failed. During the race another horse, driven by one Dale Hamilton, broke stride and fell behind Radabaugh; Radabaugh was unable to avoid finishing among the top three.
 
 
 6
 Carpenter, the undercover agent, and one Robert Hartraft talked about the incident after the race. (According to Radabaugh's later statements, Hartraft had introduced Radabaugh to the race fixing scheme.) Later Radabaugh joined in the conversation, stating "wasn't that a bastard. Boy, I sat right behind you, looked over and seen him break, and I said no. That horse of mine, I had a ton of horse in the stretch." When the agent asked Radabaugh if he had the number three horse, Radabaugh explained: "I came out three wide there.... And I said I'm gonna get fourth so I got run up on the outside. I said, I'll come back in behind you. I was counting money." At some point Hartraft apparently indicated an interest in fixing further races.
 
 
 7
 On February 1, 1985, a different FBI agent, Terry McLaughlin, phoned Radabaugh and arranged to meet him the next day to talk about the May 23 race. When they met at the appointed time, the agent served Radabaugh with a subpoena. Radabaugh admitted at that time that the May 23 race had been fixed.
 
 II
 
 8
 Radabaugh's first argument is that the district court erred in allowing Agent McLaughlin to testify as to Radabaugh's incriminating statements because Radabaugh had not been given Miranda warnings before the statements were made. Radabaugh filed a pre-trial motion for suppression of the statements; the memorandum accompanying the motion read, in its entirety, as follows:
 
 
 9
 "The defendant was asked questions by an undercover agent and the responses were tape recorded and the agent failed to disclose his true status. Later, an FBI agent approached the defendant and took his statement in regard to what transpired. While Miranda warnings were given, they were not accurate and complete nor did the defendant properly waive them. Therefore, any statements made by the defendant must be suppressed."
 
 
 10
 During the trial, when McLaughlin was about to testify about what Radabaugh said to him, the court stopped the examination and called counsel to side bar. There defense counsel argued that testimony as to the statements would not be admissible because handing a subpoena to Radabaugh was the equivalent of questioning a witness in custody. The district court allowed the testimony to be given.
 
 
 11
 On appeal, Radabaugh argues that the district court erred in failing to hold a hearing on the alleged Miranda violation. The district court was never asked to do so. Pointing to a pretrial discussion between court and counsel, however, Radabaugh argues that the court had already made up its mind that the issue of voluntariness was one for the jury. Unfortunately for Radabaugh, a careful reading of the pretrial discussion shows that it concerned the question whether, under Rule 104(a), Fed.R.Evid., there was sufficient evidence to admit co-conspirators' statements under Rule 801(d)(2)(E). The voluntariness of Radabaugh's statements in the context of Miranda was not under consideration.
 
 
 12
 Miranda, moreover, applies to custodial interrogation. See Miranda v. Arizona, 384 U.S. 436, 467 (1966). The argument that mere service of a subpoena and initiation of questioning by a government agent constitute custodial interrogation is untenable. It is undisputed that the meeting took place in a public fairground during the middle of the day and that Radabaugh had been requested to meet the agent to talk about the race. Nothing in these facts suggests that Radabaugh was in custody. Because no colorable argument exists that Radabaugh was in custody, there was no need to hold a hearing on the voluntariness of the self-incriminating statements. Jackson v. Denno, 378 U.S. 368 (1963), on which Radabaugh relies, is inapplicable.
 
 
 13
 Radabaugh also argues that there was a violation of his right to discovery of the statements given to McLaughlin because the government did not turn those statements over to him upon request. The government represented to the district court that it had complied with the discovery request. Radabaugh did not move to suppress the statements at trial because of this alleged failure to comply with his discovery request; he moved to suppress them before trial. If it were true that the government had not turned over the statements before trial, it is hard to see how Radabaugh could have been in a position to move to suppress them before trial.
 
 III
 
 14
 Radabaugh challenges the admission of Hartraft's statements on the ground that the trial court could not and did not find that the statements were made in furtherance of a conspiracy. He also contends that the district court's procedure of listening to the government's proffer and then admitting the statements conditionally was an erroneous procedure. We do not find these arguments persuasive.
 
 
 15
 There was sufficient evidence to find that a conspiracy existed and that Hartraft's statements were made in furtherance of it. Under Rule 104(a), a statement allegedly made during the course of and in the furtherance of a conspiracy may be considered in determining whether the statement is admissible under Rule 801(d)(2)(E). Bourjaily v. United States, 107 S.Ct. 2775, 2782, 97 L.Ed.2d 144, 156 (1987). Although the Supreme Court has not decided whether such statements standing alone suffice to support a district court's decision to admit evidence under Rule 801(d)(2)(E), that question is not before us. Here there is evidence independent of the co-conspirators' statements that the conspiracy existed--namely, Radabaugh's own self-incriminating statements. After te conspiracy, Radabaugh spoke to the undercover FBI agent about his inability to achieve the immediate goal of the conspiracy, the fixing of the race on May 23, 1984. The tenor of those comments was such that the trial court could properly find, as it did find, that the conspiracy continued to exist and would exist in the future. Hartraft was present during this conversation and participated in it. Accordingly, there was sufficient evidence for the trial court to find that Hartraft was a member of the conspiracy and that his statements concerning the possibility of fixing future races were made in furtherance of the conspiracy.
 
 
 16
 As to the procedure used by the trial court to determine the admissibility of these statements, the procedure was well within the discretion given the district court by our decisions in United States v. Enright, 579 F.2d 980 (6th Cir.1978), and United States v. Vinson, 606 F.2d 149 (6th Cir.1979), cert. denied, 444 U.S. 1074 (1980).
 
 IV
 
 17
 Radabaugh makes a somewhat confused attack on the jury instructions. He argues that because aider and abettor culpability was charged under 18 U.S.C. Sec. 2, the jury ought to have been told that government had the burden of showing beyond a reasonable doubt that a principal committed the offense that Radabaugh was charged with having aided and abetted. Radabaugh attempts to bolster this argument by comparing the court's charge as to the propriety of laying venue in the Southern District of Ohio with its charge on the fourth element of the conspiracy offense--the commission of an overt act in furtherance of a conspiracy. The government properly points out that there was no objection along these lines at trial, and any error was waived unless it was plain error. See Rule 30, Fed.R.Crim.P.
 
 
 18
 We see no plain error here. The court specifically charged that the jury would have to consider whether the government had shown beyond reasonable doubt that an overt act was committed in furtherance of the conspiracy. As to venue, the court charged that the government had to show that at least one of the co-conspirators committed an overt act in the Southern District of Ohio. The court charged that venue had to be proved by a preponderance of the evidence and that
 
 
 19
 "preponderance of the evidence is a definition of the burden of proof that the United States must use with regard to venue only.
 
 
 20
 The United States has a burden of proving all of the other elements of the crime in this case beyond a reasonable doubt."
 
 
 21
 Radabaugh's reliance on the aider and abetter element in the indictment is misplaced. The evidence was sufficient to let the jury treat Radabaugh as a principal. In light of the absence of an objection and of any suggestion of prejudice to the preparation of Radabaugh's defense, we can discern no basis for disturbing the conviction.
 
 V
 
 22
 Radabaugh's last two arguments are without merit. He contends that the district court erred in limiting redirect examination of Hamilton. Hamilton had been tried earlier under the same indictment and acquitted. He testified on direct examination that he was not involved in a scheme to influence races for money. On cross-examination, without objection, the government inquired about his involvment in fixing a race different from that charged in the indictment. He denied any such involvement. After this questioning, the court stated at side-bar that the government's questioning was improper. The defense made no motion to strike and did not request a limiting instruction. On redirect examination, Hamilton testified that he had taken the stand in his own defense at his trial on these charges and that he had testified then as he was testifying at Radabaugh's trial. The court did not permit Radabaugh to inquire whether Hamilton was acquitted.
 
 
 23
 There was no error here. Hamilton's testimony was favorable to Radabaugh, he denied the accusations in the government's cross-examination, and there was no objection from Radabaugh. Radabaugh now cites United States v. Johnson, 697 F.2d 735 (6th Cir.1983), for the proposition that collateral estoppel bars questioning on a supposed prior crime of which a person has been acquitted, but the government properly responds that the decision was based on the defendant being the person charged with the prior crime. The Supreme Court has held that collateral estoppel protects only the defendant who was acquitted and not a separately tried co-defendant; among other reasons, the government is not permitted to appeal a factual determination and thus does not have a full and fair opportunity to litigate it. Standefer v. United States, 447 U.S. 10, 21-25 (1980). In Johnson, the alleged prior bad act was introduced as substantive evidence against the defendant, who had been acquitted of committing it; here, the government inquired into an unadjudicated prior bad act to impeach the character of a witness under Rule 608(b). Johnson is inapposite.
 
 
 24
 We thus see no merit to Radabaugh's argument that he ought to have been permitted to have Hamilton testify that Hamilton was acquitted. The district court properly exercised its discretion under Rule 611(a) in concluding that the action of the jury in Hamilton's trial was not a proper matter for the Radabaugh jury to consider in evaluating Hamilton's credibility.
 
 
 25
 Lastly, Radabaugh contends that the district court abused its discretion under Rule 611 by recalling a government witness as its own after the close of the government's case and before the beginning of the defense case. The government witness testified that he had gone over Radabaugh's self-incriminating statements to McLaughlin with Radabaugh paragraph by paragraph, but afterwards realized that he had mistakenly confused Radabaugh in his mind with another charged co-conspirator. The witness brought this matter to the attention of the prosecutor, who informed the court that he wished to recall the witness to let him recant his testimony. The defense objected, asking permission to recall the witness later on in order to maximize the effect of the recantation. The government argued that the erroneous testimony ought to be corrected as soon as possible. The court called the witness as its own and allowed the defense to cross-examine him before allowing the government to examine him on redirect. The defense brought out that the witness had been mistaken when he testified that it was Radabaugh whose confession he had gone over line by line. We see no abuse of discretion in the course followed by the district court. The judgment of conviction is AFFIRMED.